UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HEALTH FREEDOM DEFENSE FUND, INC.<br><br>Plaintiff,<br><br>v.<br><br>US FREEDOM FLYERS, INC., ET AL.<br><br>Defendants. | Case No. 4:23-cv-00380-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are Plaintiff Health Freedom Defense Fund, Inc.'s Motion for Summary Judgment (Dkt. 71) and Defendants/Counterclaimants' Motion for Summary Judgment (Dkt. 72). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal arguments are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motions on the record. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b). For the reasons discussed below, the Court grants each motion in part and denies each motion in part.

## I. BACKGROUND

### A. Formation of the Parties and the Administration Agreement

Health Freedom Defense Fund, Inc. (HFDF), is a Wyoming public-benefit nonprofit corporation operating primarily out of Idaho; its purposes include supporting legal challenges concerning individual health rights. The Internal Revenue Service recognized HFDF as exempt

from federal income tax under 26 U.S.C. § 501(c)(3) and classified it as a public charity, effective August 18, 2020 (Dkt. 71-2 at 1–2, ¶¶ 1–2).

Approximately one year later, US Freedom Flyers began operating as a North Carolina unincorporated nonprofit association in response to COVID-19 vaccination requirements affecting airline and other transportation-industry employees (Dkt. 74 at 2–3, ¶¶ 1–4). The organization operated informally and lacked both a bank account and federal tax-exempt status (Dkt. 71-2 at 4, ¶¶ 13–18). Because a Texas entity using the same name was later formed, the Court refers to the North Carolina association as "USFF-NC," the Texas entity as "USFF-TX," and the two collectively as "USFF."

In September 2021, USFF-NC contacted HFDF regarding contemplated federal litigation challenging vaccination mandates and a mechanism through which supporters could make tax-deductible contributions (Dkt. 71-2 at 2, ¶ 7; Dkt. 74 at 3, ¶ 5). The parties' contemporaneous communications contemplated that donations would be made through a USFF-specific link, HFDF would retain a 10-percent administrative fee, and the remaining funds would be used for USFF-NC's anticipated legal efforts (Dkt. 71-4 at 299–302).

Against that backdrop, HFDF and USFF-NC executed a two-page Administration Agreement with no integration clause at the end of September 2021. Its recitals state that USFF-NC desired to "employ" HFDF "to administer, receive donations, and provide Public Relations and other services" relating to federal-mandate litigation. They further state USFF-NC was "solely responsible for providing all the necessary funds to execute" its litigation strategy and expressly defined those amounts as the "Funds" for purposes of the Agreement. The recitals also describe USFF-NC as responsible for determining the federal-mandate litigation's objectives, legal

representation, and final resolution, while characterizing the parties' relationship as "arm's-length" and not one of agency (Dkt. 71-4 at 179–80).

The operative provisions required HFDF to administer the Funds, provide public-relations and bookkeeping services, and design and maintain a donation interface "to collect Funds" (*id.* at 180). HFDF was required to direct 90 percent of all Funds received from USFF-NC to expenses directly related to the litigation and was permitted to retain the remaining 10 percent as an administrative fee (*id.* at 180, ¶ V). The Agreement also separately contemplated initial funding by USFF-NC of $75,000, followed by monthly contributions of $30,000 as necessary to pursue the federal-mandate litigation (*id.* at 180, ¶ III). It further provided that the litigation would be pursued as directed by USFF-NC and that the Agreement would terminate when the litigation was resolved or by mutual agreement (*id.* at 181, ¶ VII). The Agreement did not expressly address the disposition of any balance remaining after termination, require an automatic transfer to USFF-NC, contemplate a later-created corporation, or describe the arrangement as a fiscal sponsorship (*see id.* at 180–81).

**B. Fundraising and the Federal-Mandate Litigation**

Following execution of the Agreement, HFDF established and maintained the donation interface through a third-party provider. HFDF customized the interface for the federal-mandate litigation, provided the link to USFF-NC for placement on its website, and later placed the same link on HFDF's website (Dkt. 71-2 at 4–5, ¶¶ 19–20). The interface identified HFDF and USFF-NC as partners, referred to contributions to "our legal fund," and instructed persons donating by mail to make checks payable to HFDF and designate them "for US Freedom Flyers" (Dkt. 71-4 at 283–85).

The donor-facing language, however, changed over time. While some acknowledgments thanked donors for donations "to the US Freedom Flyers," others described donations to HFDF for litigation on USFF's behalf or donations to HFDF directed to USFF legal actions (Dkt. 71-4 at 292, 294, 296–97; Dkt. 74-3 at 1–2). HFDF deposited contributions associated with the project into a bank account it managed and separately tracked project receipts, its 10-percent administrative fee, and project expenditures (Dkt. 71-2 at 5, ¶ 21; *id.* at 7, ¶ 31; Dkt. 74 at 4, ¶ 14).

By November 2021, the contemplated litigation had materialized. HFDF, USFF-NC, and several individual plaintiffs filed an action in the Middle District of Florida challenging federal vaccination requirements, and HFDF and USFF-NC personnel thereafter communicated regularly with counsel concerning the litigation (Dkt. 71-2 at 7, ¶¶ 29–30). The federal-contractor vaccination mandate was later enjoined in separate litigation, however, and the Florida action was stayed. As a result, most of the project Funds remain unspent (*id.* at ¶ 32; Dkt. 71-1 at 5).

While the Florida litigation remained stayed, the parties' disagreement over the permissible use of the Funds sharpened. During the spring and summer of 2022, they disputed whether the Funds could be used for other litigation, USFF's incorporation in Texas and related tax-exempt application, fundraising personnel, and other organizational expenses. HFDF maintained that the Agreement limited expenditures to expenses directly related to the identified federal-mandate litigation (Dkt. 71-2 at 7–8, ¶¶ 32–34; Dkt. 71-4 at 395–99).

By July 2022, HFDF had deactivated the donation link on the USFF-NC website and produced an accounting titled "Donations (US Freedom Flyers)" (Dkt. 77 at 4, ¶ 5; Dkt. 71-2 at 7, ¶ 31; Dkt. 71-4 at 287–88). The accounting reported $763,085.19 in project contributions. From that amount, HFDF deducted $76,308.52—the contractual 10 percent—as administrative fees and $170,574.45 in paid invoices, leaving a working balance of $516,202.22 (Dkt. 71-4 at 287–88).

### C. Termination of the Relationship and Formation of USFF-TX

The parties' relationship deteriorated further in September 2022. Counsel for USFF-NC attempted to terminate the relationship, directed HFDF to freeze further expenditures, and demanded return of the remaining balance (Dkt. 71-2 at 8, ¶ 35). HFDF did not transfer the balance. The Agreement, for its part, identified termination upon resolution of the litigation or by mutual agreement and did not expressly provide for unilateral termination (Dkt. 71-4 at 180–81).

That same month, US Freedom Flyers, Inc., was incorporated as a Texas nonprofit corporation. It later obtained federal tax-exempt recognition retroactive to its incorporation (Dkt. 74 at 3–4, ¶¶ 10–11). The Court refers to that entity as "USFF-TX."

The founders of USFF-NC executed a resolution stating that USFF-NC had "subsequently determined" that incorporation and independent tax-exempt recognition would serve its long-term interests, which "resulted in the formation" of USFF-TX (Dkt. 74-2 at 2). The resolution and related assignments purported to transfer USFF-NC's assets, liabilities, contractual interests, and claims to USFF-TX (Dkt. 74 at 4, ¶¶ 12–13; Dkt. 74-2 at 1–7). Although the documents were designated effective September 21, 2022, most of the signatures or notarizations occurred in April 2023 (Dkt. 74-2 at 1–7).

Meanwhile, the Florida litigation was dismissed on April 23, 2023. That dismissal resolved the litigation identified in the Administration Agreement and, under the Agreement's express terms, triggered its termination provision (Dkt. 71-1 at 5; Dkt. 71-4 at 180–81). Three days later, counsel acting for USFF again demanded transfer of the Funds, this time asserting that USFF-TX had succeeded to USFF-NC's rights. HFDF again declined (Dkt. 71-2 at 9, ¶ 37).

**D. Disposition of the Remaining Funds and This Litigation**

With the underlying federal-mandate litigation concluded but more than $500,000 still remaining, the dispute shifted from how the Funds could be spent during the project to who could spend them after the project ended.

In June 2023, HFDF sought guidance from the Idaho Attorney General concerning the disposition of the project Funds and possible modification of restrictions governing their use (Dkt. 71-2 at 10, ¶ 44). HFDF advised the Attorney General that it held $522,987.93 associated with the project, subject to limited remaining expenses from the Florida litigation. HFDF sought authorization to use the balance for similar mandate-related litigation and identified transfer to another suitable nonprofit, potentially USFF-TX, as one possible disposition (Dkt. 71-4 at 509–13). HFDF continues to hold more than $500,000 attributable to the project (Dkt. 71-1 at 5). The Attorney General declined to take a position on who was entitled to retain the Funds and declined to become involved in the dispute (Dkt. 23-3; *see* Dkt. 38 at 8).

HFDF then filed this lawsuit seeking a determination of the proper disposition of the remaining Funds under Idaho Code § 33-5006 and common-law cy pres principles, and to modify any restrictions governing their use (Dkt. 1-1 at ¶¶ 1, 35; Dkt. 71-2 at 10, ¶ 45). The remaining counterclaims asserted by USFF-NC and USFF-TX seek declaratory and injunctive relief requiring transfer of the Funds, as well as to recover damages (*see generally*, Dkt. 12).

Although the parties substantially agree that the remaining Funds should continue to support causes related to the project's underlying subject matter, they disagree over who has the legal authority to decide how those Funds are used (Dkt. 71-1 at 16–20; Dkt. 74 at 7; Dkt. 71-4 at 509–13). Problematically, the parties' briefing does not neatly frame the issues the Court must decide in order to resolve that disagreement. Their arguments frequently focus on issues which

will not resolve this matter, and touch on federal tax principles, donor intent, fiscal sponsorship, contract interpretation, fiduciary duties, charitable-asset law, and ultimate entitlement to the remaining Funds without consistently distinguishing the separate legal questions those doctrines address.

As a result, neither party's analytical framework provides a workable path to resolving this dispute. The Court therefore organizes the dispute according to the more basic legal questions presented by the record: what rights the parties created by contract; how the Agreement allocated the parties' interests in the project Funds; whether either party breached duties arising from their relationship; and what law governs disposition of the remaining balance now that the underlying litigation has ended. Where appropriate, the Court notes and addresses the parties' specific positions, but it does not endeavor to catalogue and address each merely for the sake of completeness. Nonetheless, the Court has reviewed and considered the record and the parties' filings.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the nonmoving party must present evidence upon

which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party cannot simply rely on unsworn assertions or the pleadings to defeat a motion for summary judgment; rather, the nonmoving party must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

Where parties file cross-motions for summary judgment on the same issue, the Court considers each motion on its own merits and reviews all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Cross-motions do not by themselves establish that no genuine dispute of material fact exists. *Id.*

## III. ANALYSIS

### A. Preliminary Issues

#### 1. Operative Pleadings

This case's procedural history requires clarification regarding the pleadings and the parties presently before the Court. Defendants filed the First Amended Answer and Counterclaim identifying USFF-NC, USFF-TX, and Joshua Yoder as counterclaimants. In July 2024, the Court dismissed Yoder's counterclaims for lack of standing (Dkt. 38 at 18–20; Dkt. 39). Counterclaimants did not file an amended pleading.

Counterclaimants later moved for leave to file a proposed Second Amended Answer and Amended Counterclaim that would have added Leslie Manookian as a counterdefendant, asserted

a breach-of-fiduciary-duty claim against Manookian, added an Idaho Consumer Protection Act counterclaim against Manookian and HFDF, and made other revisions (Dkt. 48). The Court denied leave to add Manookian and the proposed consumer-protection counterclaim but permitted Counterclaimants to file a limited amended pleading (Dkt. 67 at 6–13, 15–16). Counterclaimants did not file that pleading either.

Accordingly, the operative complaint remains HFDF's state-court-filed Complaint for Declaratory Judgment, attached to the Notice of Removal (Dkt. 1-1); the operative counterclaims remain those pleaded in the First Amended Answer and Counterclaim; Yoder remains a defendant to HFDF's declaratory claim but has no operative counterclaim.[1]

**2. Objections**

The parties raise several procedural and evidentiary objections. USFF asks the Court to disregard HFDF's statement of disputed facts because it does not specifically admit or deny USFF's asserted facts (Dkt. 79 at 2). The Court declines to require the specificity USFF requests. Rule 56(e) of the Federal Rules of Civil Procedures permits, but does not require, the Court to treat an inadequately addressed factual assertion as undisputed. Here, rather than engage in large scale factual exclusion based on a perceived technical shortcoming, the Court independently considers whether the parties' positions are supported by an admissible record.

USFF separately objects under Rule 56(c)(2) to several factual assertions in HFDF's statement of material facts and portions of Manookian's declaration, principally arguing the cited materials do not support the stated assertions or that the challenged evidence lacks foundation or

---

[1] Although Dkt. 72 includes Yoder among the movants, Defendants acknowledge that USFF-NC and USFF-TX are the two counterclaimants and that the individual defendants do not seek receipt of the Funds (Dkt. 79 at 2 n.1). The Court therefore considers the affirmative relief requested in Dkt. 72 only as to USFF-NC and USFF-TX.

relevance or contains argumentative characterizations (Dkt. 77 at 2–3). The Court considers only evidence which could be presented in an admissible form at trial.

HFDF, meanwhile, contends that several witnesses, declarations, expert opinions, and an additional document were not previously disclosed but expressly declines to seek their exclusion (Dkt. 80 at 1 n.2, 5 n.6). Because HFDF seeks no relief based on those disclosure objections and the challenged materials are unnecessary to the dispositive rulings below, the Court does not resolve the parties' disclosure disputes.

### B. Declaratory Claims: Competing Rights in the Remaining Funds

The federal Declaratory Judgment Act authorizes the Court to declare the parties' rights in a case of actual controversy. 28 U.S.C. § 2201(a). An actual controversy exists here concerning the parties' respective contractual interests in and control of the remaining balance.

HFDF seeks a declaration permitting it to retain the remaining project balance and redirect the money to other vaccine- or health-mandate litigation under the Uniform Prudent Management of Institutional Funds Act (UPMIFA) and common law cy pres principles. USFF-NC and USFF-TX seek the contrary declaration that HFDF has no right to the funds and that USFF-TX, as USFF-NC's alleged successor, is the rightful holder (Dkt. 1-1 at ¶ 35; Dkt. 12 at ¶¶ 89–90).

Specifically, HFDF argues the contributions belong to it because donors paid HFDF; HFDF deposited the money and issued charitable acknowledgments; and federal tax law required HFDF to retain control and discretion over charitable contributions (Dkt. 71-1 at 3–11; Dkt. 78 at 2–5). USFF responds that those circumstances concern how HFDF received the money, not the parties' contractual rights in it. According to USFF, the Administration Agreement governed the fundraising arrangement, allocated 90 percent of the Funds to USFF's litigation project, and permitted HFDF to retain only its 10-percent administrative fee (Dkt. 73 at 2–7; Dkt. 76 at 2–7).

Resolving these competing declaratory requests requires the Court to determine what rights the parties' agreement sufficiently defined and whether the donations at issue were governed by the Agreement's structure.

The Agreement provides that Idaho law governs the Agreement and the parties' rights and obligations arising from it (Dkt. 71-4 at 180). Under Idaho law, interpretation of an unambiguous contract presents a question of law. *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 226 P.3d 1277, 1280 (Idaho 2010). The Court gives effect to the agreement the parties made, considers the contractual language as a whole, and does not add terms the parties omitted. *Nuquist v. Bauscher*, 227 P.2d 83, 87 (Idaho 1951). Although brief, the Agreement unambiguously defines the parties' respective contractual roles; the allocation of the project Funds between them; and the duration of HFDF's authority. The discrete contributions by Tammy Smart and Joshua Allen that may have been omitted from HFDF's project accounting are addressed separately below.

**1. The Balance HFDF Holds is "Funds" under the Agreement**

USFF-NC "desire[d] to employ" HFDF "to administer, receive donations, and provide Public Relations and other services" concerning anticipated federal-mandate litigation (Dkt. 71-4 at 179). HFDF also agreed to provide bookkeeping services and to design and maintain a donation interface "to collect Funds" (*id.* at 180). The Agreement, in turn, made USFF-NC solely responsible for "providing" the Funds. Thus, the parties contemplated that supporters would supply the money directly through the fundraising mechanism HFDF administered while treating those receipts, as between the parties, as funds USFF-NC was responsible for providing. HFDF's performance reinforces that understanding. Its accounting identified $763,085.19 in "Donations (US Freedom Flyers)" as gross project receipts, calculated its $76,308.52 administrative fee as exactly 10 percent of that amount, separately deducted project invoices, and carried the remainder

forward as the project's working balance (Dkt. 71-4 at 287–88).[2] That is, HFDF applied the Agreement's fee-and-expense structure directly to the donation pool and administered the remainder as the USFF project balance.

The particular manner in which a contribution was received—through the third-party interface, by mail, wire, or ACH—does not alter the contractual character of amounts HFDF accounted for as project contributions. Manookian testified that donations processed through HFDF's interface were either deposited directly into HFDF's bank account or received by check and then deposited into that account, and that the money disputed in this action remained there (Dkt. 72-4 at 2, Manookian Dep. 19:12–19). HFDF's July 2022 accounting likewise treated $763,085.19 as project contributions and the resulting $516,202.22 as the project working balance (Dkt. 71-4 at 287–88).

Consequently, the Court need not trace the accounted-for project balance dollar-by-dollar among third-party hosted transactions, mailed checks, wires, or ACH transfers. The Court treats that presently held project balance as contractual Funds, just as the parties do. Whether the discrete contributions by Smart and Allen should have been added to that balance is a different question reserved below.

### 2. As Between HFDF and USFF-NC, the Agreement Allocates Unspent, Non-Fee Funds to USFF-NC

The Court need not determine whether HFDF held legal title to individual charitable contributions upon receipt. The narrower question is what interests the Administration Agreement

---

[2] Although the Court finds the agreement unambiguous in this respect, it also recognizes the Agreement lacks a traditional integration clause. Even if the language were ambiguous, the parties' contemporaneous communications confirm that donations were the contemplated funding mechanism. Before execution, Manookian explained that donations made through USFF-NC's unique link would be "tagged to go to your legal efforts less the 10% fee" (Dkt. 71-4 at 302).

allocated between HFDF and USFF-NC. In that respect, the Agreement gave HFDF a right to retain 10 percent of the project Funds as compensation and authority to administer the remaining 90 percent only for the contractually identified project. Nothing in the Agreement granted HFDF an unrestricted interest in the 90-percent balance or authorized HFDF, after the Agreement terminated, to treat that balance as its own property. Instead, it authorized HFDF to "administer" and "direct" the Funds and to "retain" only 10 percent as its fee.

HFDF argues that because donors paid the money directly to HFDF and HFDF deposited it into its own account, the money belonged to HFDF. But that interpretation gives no effect to the Agreement's express allocation of responsibility to USFF-NC to "provide" the Funds and collapses the distinction between HFDF's authority to "administer" 90 percent and "retain" 10 percent as compensation. That is not a reasonable reading of the parties' Agreement.

HFDF's federal-tax law arguments do not alter that contractual allocation. The tax authorities HFDF cites may explain why deductible contributions were paid to HFDF and why HFDF could not operate as a passive conduit lacking meaningful control over their charitable use. They do not determine the parties' contractual interests under Idaho law. Nor does the Court conclude that USFF-NC possessed an unconditional right during the Agreement's term to compel distribution of charitable assets irrespective of HFDF's tax and charitable-law obligations. Those obligations constrained HFDF's administration of the Funds; they did not enlarge the interest the parties allocated to HFDF by contract. Tax and charitable-law principles may still constrain how the balance may be used or transferred.[3]

---

[3] USFF-NC also argues the arrangement should be understood as a temporary fiscal sponsorship because HFDF knew USFF-NC eventually intended to become its own § 501(c)(3) organization. The Court is not persuaded on the law or the facts. The contemporaneous record shows USFF asked about access to tax-deductible fundraising (Dkt. 75-1 at 1–2). But the executed

The parties are correct that the Agreement does not expressly address the disposition of Funds remaining after the litigation ends. That omission does not create an interest in HFDF, however. The Agreement defines the parties' respective contractual interests; silence concerning a later contingency does not reallocate those interests. Resolving questions concerning USFF-NC's organizational authority to hold or later transfer any property interest allocated to it is not necessary to resolve the parties' contractual rights here.

Similarly, even if the Court consults non-contractual evidence, the differing language directed to donors does not create a genuine dispute concerning the parties' contractual allocation. The interface identified HFDF and USFF as partners, referred to contributions to "our legal fund," and instructed persons donating by mail to make checks payable to HFDF and designate them "for US Freedom Flyers" (Dkt. 71-4 at 283). Some early acknowledgments thanked donors for a donation "to the US Freedom Flyers," while later acknowledgments described a donation to HFDF for litigation on USFF's behalf or a donation to HFDF directed to USFF legal actions (Dkt. 71-4 at 292, 294, 296–97; Dkt. 74-3 at 1–2). That varying language may bear on the precise charitable restriction accompanying the Funds. It does not change the Agreement between HFDF and USFF-NC. HFDF could not enlarge its contractual property interest by changing the wording of post-Agreement acknowledgments made to third parties.

Finally, the Agreement's termination resolves HFDF's substantive authority over the balance (*see* Dkt. 71-4 at 180–81). The Florida litigation was dismissed on April 23, 2023, and the

---

Agreement does not use the term "fiscal sponsorship," describe the arrangement as temporary pending obtaining tax exemption, or require transfer to a later-created corporation (Dkt. 71-4 at 178–81). Moreover, USFF-NC's own resolution reflects it "subsequently determined" (meaning, after entering into the Administration Agreement) that formal incorporation and tax-exempt recognition would serve its long-term interests (Dkt. 74-2 at 2).

Agreement terminated on that date. After termination, HFDF had no continuing contractual entitlement to administer, expend, redirect, or claim the 90-percent project balance as its own.

Accordingly, under Rule 56(a), the Court grants USFF-NC's motion in part on its counterclaim for declaratory relief and denies HFDF's motion on its competing request for declaratory relief. As between HFDF and USFF-NC, HFDF's contractual interest in the project funds is limited to its 10-percent administrative fee. The remaining 90 percent was committed to USFF-NC's litigation project and was subject only to HFDF's contractual authority to administer those Funds for that purpose. The Agreement terminated on April 23, 2023, after which HFDF had no contractual right to administer, expend, redirect, or claim the 90-percent project balance as its own. USFF-TX's request to be declared the rightful holder depends on whether USFF-NC subsequently transferred that interest through the asserted assignments. The Court does not decide whether those assignments were effective.

**C. UPMIFA and Cy Pres**

HFDF asks the Court to modify the asserted charitable restriction under UPMIFA and cy pres principles so that HFDF may use the remaining balance for other vaccine- or health-mandate litigation (Dkt. 71-1 at 16–20). USFF-NC and USFF-TX respond that UPMIFA does not apply, that the money constitutes program-related assets, and that the original purpose remains achievable through USFF's continuing work (Dkt. 73 at 7–10; Dkt. 76 at 7–12).

The Court need not resolve the parties' threshold disputes concerning UPMIFA's application. Even assuming HFDF may invoke Idaho Code § 33-5006(3) with respect to the Funds, that provision authorizes judicial modification of a charitable purpose or restriction on the use of an institutional fund under specified circumstances; it does not create or enlarge an applicant's contractual interest in the property. HFDF's requested relief depends on its claimed right to retain

the 90-percent project balance and select its substitute use. As explained above, the Administration Agreement did not give HFDF that interest, and its contractual authority to administer the project ended when the identified litigation was resolved. Accordingly, HFDF is not entitled to the particular UPMIFA relief it requests. The Court need not decide what particular future uses or transfers are permissible under federal tax law, UPMIFA, donor restrictions, or other charitable-law principles. Any applicable restriction continues to govern the Funds.

The same reasoning defeats HFDF's request under cy pres: modification of a charitable purpose does not supply HFDF with a contractual right to retain and administer Funds that the Agreement no longer authorizes it to control. Accordingly, summary judgment is granted on these theories.

**D. Breach of the Administration Agreement**

USFF-NC argues HFDF breached the Administration Agreement in two general respects. First, it contends HFDF failed to manage and dispose of the project Funds as the Agreement required, including by continuing to withhold the remaining balance after the litigation ended, charging non-project expenses against the Funds, and failing to credit certain contributions to the project. Second, USFF-NC contends HFDF inadequately performed its other, nonmonetary contractual obligations concerning public relations, bookkeeping, litigation management, weekly accountings, and designing the donation interface (Dkt. 73 at 12–13; Dkt. 76 at 9–10).

HFDF responds that the Agreement contains no weekly-reporting, donor-list, or automatic-transfer provision; USFF-NC participated in the litigation; that HFDF provided the agreed services; and USFF-NC has not shown damages caused by any asserted deficiency (Dkt. 71-1 at 12–14; Dkt. 78 at 9–10; Dkt. 78-1 at 6–7). HFDF also denies that the project fund was depleted through misallocation, asserting that the only identified ACH error was promptly corrected

(Dkt. 71-1 at 13). Even when breach is established, the claimant must show resulting injury; a breach that causes no recognized injury may not support a compensable recovery. *See McOmber v. Thompson*, 572 P.3d 736, 750 (Idaho 2025); *City of Meridian v. Petra Inc.*, 299 P.3d 232, 250–52 (2013).

**1. Management and Disposition of the Funds**

The Agreement's allocation of the project interest to USFF-NC does not establish that HFDF breached the Agreement by failing to transfer the balance when the litigation ended. The Agreement does not address the post-termination disposition of unused Funds, require their return to USFF-NC, or prescribe the timing or mechanics of any transfer. The Court recognizes the parties' resulting quandary, but it cannot convert the Agreement's silence into an affirmative *contractual* obligation the parties did not include. HFDF's continued possession therefore presents an issue of declaratory relief, as addressed above, but does not independently establish a breach of contract. HFDF is entitled to summary judgment on USFF-NC's breach-of-contract claim to the extent it is based solely on HFDF's failure to return the Funds after April 23, 2023.

USFF-NC's remaining fund-management breach of contract theories are different because they concern HFDF's performance while administering the Funds. Each theory, however, ultimately encounters the same evidentiary problem: the record does not establish whether the challenged transaction actually changed the amount of project Funds HFDF now retains. More specifically, USFF-NC contends HFDF charged a $2,665 non-project legal expense against the Funds, failed to credit certain recurring donations made by Smart to the USFF project, and failed to credit a $1,000 contribution from Allen allegedly made for the project through the Weston A. Price Foundation (WAPF) (Dkt. 76 at 9–10; Dkt. 79 at 7–8).

As to the $2,665 legal expense, USFF-NC has not produced evidence that the challenged invoice reduced the project balance. The invoice reflects work involving review of proposed additional litigation, its potential relationship to or conflict with the pending federal-mandate case, and communications concerning the parties' developing disagreement (Dkt. 76-4 at 99–100). But the same invoice states that no payment had been received and that the entire $2,665 remained due (*id*. at 100). A later statement likewise continued to list the invoice with $0.00 in payments received and the full $2,665 outstanding (*id*. at 103). Thus, even assuming some of the work reflected on the invoice fell outside the Agreement's permitted purposes, the record affirmatively shows that this particular invoice remained unpaid and did not reduce the Funds. This theory of breach therefore fails.

The payments by Smart present a different issue. Smart states that she made six donations totaling $206.81 and that, to her recollection, she made the donations through the USFF website (Dkt. 60-1 at 1–2). HFDF's internal Record of Contributions categorized the initial payment as "Donations (US Freedom Flyers)" but categorized the later recurring payments as "General Donations" (*id*. at 1–6). The question, then, is whether Smart's recurring payments arose from the USFF fundraising mechanism that the Agreement governed.

The parties dispute whether Smart's donations arose from the same USFF donation commitment (*see* Dkt. 71-4 at 52, Manookian Dep. 108:8–24). Even assuming the recurring payments should have been treated as Funds, however, the present record does not establish that HFDF's "General Donations" designation caused those payments to be excluded from the project accounting. Accordingly, the Court cannot determine on the present record whether HFDF's treatment of Smart's payments depleted project Funds or was merely a change in nomenclature.

Allen's $1,000 WAPF contribution presents a similar issue. Allen submitted a signed complaint to the Idaho Attorney General stating that he donated $1,000 for USFF through HFDF and wanted the money either returned or applied to USFF as intended. The accompanying payment confirmation shows a $1,000 payment to WAPF (Dkt. 23-4 at 2–4). HFDF acknowledges that Allen donated $1,000 through WAPF but maintains that its records contain no notice from Allen designating the contribution for the federal-mandate litigation. Manookian explains that HFDF instructed persons donating through WAPF to separately notify HFDF of the project to which their contribution should be allocated (Dkt. 80-1 at 9–10, ¶¶ 5–6).

The summary-judgment record also does not answer the accounting question that would matter if Allen's payment was a USFF project contribution: whether the $1,000 was included in or excluded from HFDF's reported project contributions and retained balance. Thus, even if the payment should have been treated as a USFF contribution, the Court cannot determine on the present record whether HFDF's treatment of the payment reduced the Funds.

Accordingly, HFDF is entitled to summary judgment on USFF-NC's $2,665 legal-expense theory because the record affirmatively shows that the challenged invoice remained unpaid and did not reduce the project Funds. The Smart and Allen theories are different because the present record leaves unresolved whether the challenged contributions were attributable to the USFF project and, if so, whether HFDF's accounting treatment affected the project balance. The Court therefore denies summary judgment for either party on the portions of the parties' cross-motions concerning the Smart and Allen contributions and orders limited supplemental submissions described below.

### 2. Other Performance Obligations

USFF-NC's remaining theories concern HFDF's performance of services rather than its management or disposition of the project Funds. Those theories include allegedly inadequate public relations, insufficient or untimely accountings, interference with USFF-NC's participation in litigation management, and mishandling of donor information.

The parties dispute both the scope of those obligations and the adequacy of HFDF's performance. The Court need not resolve every disagreement concerning either issue, however, because USFF-NC has not produced evidence that any alleged performance deficiency caused a distinct injury. USFF-NC generally asserts that HFDF's conduct impaired its mission and access to supporters, but its identified injury is principally the denial of access to the project Funds. Indeed, USFF-NC asserts that HFDF's control of those Funds prevented it from accomplishing the breadth of its mission and caused "great damage" to its work in the airline industry (Dkt. 74 at 7). That alleged injury arises from the parties' dispute over possession and control of the Funds, not from the quality of HFDF's public-relations work, the timing of an accounting, the extent of consultation with litigation counsel, or HFDF's handling of donor information.

More substantively, USFF-NC's summary-judgment submissions identify no contribution lost because of inadequate public relations, additional expense caused by a delayed accounting, litigation result affected by insufficient consultation, or identifiable donor or contribution lost because donor information was withheld (*see* Dkt. 73 at 12–13; Dkt. 76 at 9–10; Dkt. 79 at 7–8).[4] To the extent USFF-NC contends inadequate public-relations or donor-related services constitute breach, it does not connect any asserted deficiency to an identifiable damage. More than $500,000

---

[4] To the extent USFF seeks summary judgment on separate injunctive relief concerning donor information, that request is denied; USFF has not established any entitlement to such relief.

in excess contributions remained after the litigation ended (Dkt. 71-4 at 287–88; Dkt. 71-1 at 5). The fatal issue at this point, however, is that USFF-NC provided no evidence addressing how the alleged breaches caused it harm. The gravamen of the parties' present dispute is control of the substantial balance already raised, not an identifiable loss caused by deficient public-relations work, delayed accountings, insufficient litigation consultation, or donor-information handling.

HFDF is therefore entitled to summary judgment on the contract theories based on allegedly inadequate public-relations services, accounting frequency, interference with litigation management, and donor-information handling.

**E. Breach of Fiduciary Duty**

USFF-NC argues HFDF owed a fiduciary duty because HFDF possessed and administered project Funds in which USFF-NC held the contractual interest, maintained a separate project accounting, referred to the balance as a "USFF account," and possessed greater nonprofit and tax-exempt-donation experience. USFF-NC characterizes the relationship as a fiscal sponsorship (Dkt. 73 at 3–6). HFDF responds that the parties created a limited contractual relationship, expressly characterized it as arm's length and nonagency, and gave HFDF only the circumscribed, administrative authority specified in the Agreement (Dkt. 71-1 at 14–16; Dkt. 78 at 3–5).

Under Idaho law, entrustment and control over another's property are relevant to whether a fiduciary relationship exists. *Country Cove Dev., Inc. v. May*, 150 P.3d 288, 296 (Idaho 2006); *see Skinner v. U.S. Bank Home Mortg.*, 365 P.3d 398, 403–06 (Idaho 2016). The inquiry also considers whether one party occupied a superior position enabling it to influence a party who reposed special trust and confidence in it, and whether the circumstances gave the trusting party a reasonable basis to believe the other was acting primarily in its interests rather than its own. *High Valley Concrete, L.L.C. v. Sargent*, 234 P.3d 747, 752 (Idaho 2010). While entrustment of property

is relevant, the existence and scope of a fiduciary duty depend on the nature of the parties' relationship and undertaking. *See Skinner*, 365 P.3d at 403.[5] An arm's-length business relationship does not become fiduciary merely because one party trusts the other's judgment. *City of Meridian*, 299 P.3d at 249-50 (finding no fiduciary duty even where contract described relationship as one of trust and confidence when facts reflected independent judgment, arms-length relationship, and no special trust reliance beyond professional judgment).

That standard is not satisfied here. USFF relies principally on two circumstances: HFDF possessed and administered money in which USFF-NC held the contractual interest, and HFDF had greater experience with nonprofit fundraising and federal tax-exempt requirements. The first circumstance weighs in USFF-NC's favor. But it does not, by itself, resolve whether the parties' relationship otherwise possessed the characteristics Idaho associates with a fiduciary undertaking. The record does not show that USFF-NC surrendered control of its organizational affairs to HFDF or that HFDF undertook to exercise discretionary judgment primarily for USFF-NC's benefit. Instead, the Agreement defined a limited administrative undertaking, and the surrounding circumstances do not establish the special confidence, dominance, or advisory influence necessary to create fiduciary obligations beyond that undertaking. The Agreement expressly left the litigation's objectives, legal representation, and final resolution with USFF-NC (Dkt. 71-4 at 179).

Second, HFDF's greater familiarity with nonprofit fundraising and § 501(c)(3) requirements does not establish the necessary superiority or special confidence. The record supports that USFF-NC sought HFDF's assistance because it lacked a bank account and tax-

---

5 Unlike *Skinner*, this case does not involve a lender's administration of disbursement proceeds. Although HFDF possessed and disbursed the Funds, its authority was contractually constrained, while USFF-NC retained responsibility for the litigation's objectives, legal representation, and final resolution.

exempt status and wanted a mechanism for receiving tax-deductible contributions (Dkt. 71-2 at 4, ¶¶ 13–18; Dkt. 75-1 at 1–2). That reliance concerned HFDF's ability to provide fundraising and administrative services; it does not show that HFDF assumed an advisory role over USFF-NC's organizational affairs or that USFF-NC reasonably entrusted HFDF to protect its broader interests. The parties' interests were not necessarily aligned, and the Agreement itself described their relationship as arm's length and not one of agency (Dkt. 71-4 at 180).

Even viewing the record in USFF-NC's favor, the actual evidence of reliance does not establish a fiduciary relationship. Yoder states that, when Manookian told him the contract prevented use of the donated Funds for USFF-NC's incorporation, he "trusted that her interpretation was correct at that time, given her experience in these matters" (Dkt. 79-1 at 3, ¶ 12). That testimony shows reliance on Manookian's experience, but reliance on another party's expertise does not transform an arm's-length contractual relationship into a fiduciary one. *See City of Meridian*, 299 P.3d at 249-50. The course of dealing likewise does not show that USFF-NC surrendered substantive decision-making to HFDF. To the contrary, Yoder states that Manookian requested permission to pay Pierce Law, which Yoder gave (Dkt. 79-1 at 3–4, ¶ 14). Separate tracking of the project balance and references to a "USFF account" similarly reflect HFDF's contractual administration of the project Fund, not an additional advisory or fiduciary undertaking (Dkt. 71-4 at 287–88; Dkt. 74-1 at 1).

USFF-NC's preferred label of "fiscal sponsorship" does not alter the analysis. USFF-NC argues HFDF knew USFF-NC ultimately intended to become an independent tax-exempt organization, but USFF-NC identifies no contemporaneous evidence establishing that, when the Administration Agreement was executed, HFDF understood the arrangement to be temporary pending USFF-NC's independent tax-exempt recognition. Plus, USFF-NC's own later resolution

states it "subsequently determined" that incorporation and tax-exempt recognition would serve its long-term interests (Dkt. 74-2 at 2). That later statement undercuts the contention that the original undertaking included a preexisting plan for incorporation followed by automatic transfer as part of a "fiscal sponsorship." In any event, the label does not establish a fiduciary duty under Idaho law.[6]

Because possession and administration of USFF-NC's project fund, without more, does not create a fiduciary relationship under Idaho law, HFDF is entitled to summary judgment on the fiduciary-duty counterclaim. The Court therefore does not reach whether any alleged conduct would constitute breach.

**F. Assignment and Successorship**

USFF-TX argues it is the lawful continuation or assignee of USFF-NC and therefore may enforce USFF-NC's rights. HFDF disputes the assignments and relies on alleged inconsistencies in USFF-TX's formation documents, governance records, and tax filings (Dkt. 73 at 10–12; Dkt. 78 at 5–9).

The validity of the asserted succession is unnecessary to determine HFDF's rights under the Agreement. USFF-NC is the entity that executed the Agreement and remains a party to this action. The Court therefore declines to grant USFF-TX a separate declaration that it is USFF-NC's lawful successor and denies that portion of its motion. Nothing in this Order enlarges HFDF's interest in the project Funds or resolves what lawful organizational action USFF-NC may have taken, or may later take, concerning its contractual interest.

---

[6] The parties discuss *MobilizeGreen, Inc. v. Cmty. Found. for the Cap. Region*, 267 A.3d 1019, 1026–27 (D.C. 2022). That case is not binding and, in any event, does not establish that a fiscal sponsorship is necessarily fiduciary in nature. *Id*. (explaining that a fiscal-sponsorship label does not itself establish fiduciary duties; the parties' actual undertaking controls).

**G. Forensic Audit and Limited Supplemental Briefing**

USFF requests a forensic audit of HFDF's accounting (Dkt. 79 at 8, 11). That request was developed in reply, and USFF identifies no contractual provision, alleged independent claim, or governing authority entitling it to a broad court-ordered audit as summary-judgment relief. The request is therefore denied.

The Court agrees, however, that limited supplemental facts will assist in determining the precise project balance and may permit the remaining discrete accounting disputes to be resolved without trial. As explained above, the present record does not establish whether the Smart and Allen contributions were properly attributable to the USFF project or, if so, whether HFDF actually omitted them from the project accounting. The Court has therefore denied both parties' motions for summary judgment on those theories without prejudice.

To narrow the remaining issues and determine the precise balance subject to the declaratory ruling, the parties shall submit transaction-level evidence addressing only: (1) whether Tammy Smart's recurring donations were attributable to the USFF project and, if so, whether they were included in HFDF's project accounting; (2) whether Joshua Allen's $1,000 WAPF contribution was designated or otherwise communicated as a USFF project contribution and, if so, whether it was included in HFDF's project accounting; and (3) a transaction-level reconciliation of the project balance from April 23, 2023, through the date of submission, identifying every later addition or deduction. The supplemental proceedings are not an opportunity to relitigate any issue resolved in this Order.

## IV. ORDER

**IT IS ORDERED:**

1. Plaintiff Health Freedom Defense Fund, Inc.'s Motion for Summary Judgment (Dkt. 71) is GRANTED IN PART and DENIED IN PART. The motion is granted on the breach-of-fiduciary-duty counterclaim; the breach-of-contract theory based solely on failure to return the Funds after termination; the breach-of-contract theory concerning the challenged $2,665 legal invoice; and the breach-of-contract theories based on allegedly inadequate public-relations services, accounting frequency, interference with litigation management, and donor-information handling. The motion is denied without prejudice to the extent it concerns the Smart and Allen contribution theories..

2. Defendants/Counterclaimants' Motion for Summary Judgment (Dkt. 72) is GRANTED IN PART and DENIED IN PART. The motion is granted on the declaratory-relief counterclaim to the following extent: (a) the presently accounted-for project balance consists of Funds governed by the Administration Agreement; (b) HFDF's contractual interest in the project Funds was limited to its 10-percent administrative fee; (c) the remaining 90 percent was committed to USFF-NC's litigation project and was subject to HFDF's contractual authority to administer those Funds for that purpose; (d) the Administration Agreement terminated on April 23, 2023; and (e) after termination, HFDF had no contractual right to administer, expend, redirect, or claim the 90-percent project balance as its own. The motion is granted as against HFDF's claims under UPMIFA and cy pres, and HFDF is not entitled to relief under those theories. The motion is denied to the extent it seeks judgment that USFF-TX is USFF-NC's lawful successor or the present holder of the Funds and is denied as to the resolved $2,665 legal-invoice and other performance-based

contract theories. The motion is denied without prejudice to the extent it concerns the Smart and Allen contribution theories.

3. USFF's request for a forensic audit is DENIED.

4. Within **fourteen (14) calendar days** after entry of this Order, each side shall file a supplemental memorandum, not exceeding ten pages, with transaction-level evidence limited to the matters identified in Section III.G. Responses, not exceeding five pages, are due **seven (7) days** after the opening memoranda. No reply is permitted absent leave of Court.

i. The supplemental briefing may not revisit any issue resolved in this Order. If the submissions establish an undisputed project balance, the Court will fix it by further order. Either side may thereafter renew summary judgment, limited to the Smart and Allen contribution theories. Any genuinely disputed material fact concerning those transactions will remain for trial.

**DATED:** August 18, 2026

Amanda K. Brailsford
U.S. District Court Judge